Good afternoon. Please sit down. Thank you. Now I will call the last case on the calendar, a portion of which we will hear in open court. And that case is American Civil Liberties Union versus the Central Intelligence Agency. We'll hear from the ACLU as appellees, but they will do this here in open court. Thank you, Your Honor. Joy Ledeen here for the American Civil Liberties Union. I know. This is unusual, so I'm going to do my best without the benefit of what the government is offering. I think in order to do that, I'd like to begin with just a couple legal points on exemptions 1 and 3, and then maybe offer our view as to how the ex parte proceeding should take place. So first of all, Your Honor, we would submit that the most relevant case for considering the exemption 1 issue in this case is New York Times versus Department of Justice, which is in both briefs, obviously. The key piece of information that this court was analyzing was an undisclosed discussion of a statutory authority that the government was analyzing as part of a drone mission. And the government's argument there was that exemption 1 covered the statutory analysis, notwithstanding the fact that the statutory analysis would ordinarily not be an intelligence source or method. The idea was that in some contexts, this public information could be properly withheld because its disclosure would tend to reveal a classified fact or increase the risk of such revelation. And this court evaluated that claim, and it said, given everything else that has been disclosed in this document, which is to say the facts that were disclosed, the other statutory analysis that had been disclosed, this additional statute, which both sides agreed was not public, could be disclosed without any further risk to any properly classified facts. And that's highly relevant here because a large part of what the parties have been discussing, again, to the extent that we know what we're discussing, which is limited under the circumstances, is the redaction of public newspaper articles from this retrospective account. And those public newspaper articles, both sides would agree, are not ordinarily classified. They are, in fact, public. Under certain circumstances, and we don't take issue with this, public materials may be properly withheld as part of a classified document, but there has to be a logical and plausible reason why. And so in New York Times, this court made precisely the kind of de novo judgment as to whether it was still logical and plausible to withhold this undisclosed public discussion, or excuse me, undisclosed discussion of public materials, and decided that this could be disclosed. The second sort of exemption arena we're discussing is Exemption 3. And there I think, if I'm reading the government's briefs correctly, they're stretching Exemption 3 far beyond what the Supreme Court contemplated in C.I.A. v. Sims or what the D.C. Circuit was talking about in Fitzgibbons. I think some of the government's arguments about Exemption 3 suggest that in a way it swallows Exemption 1, that there's no document that this court could review de novo as to Exemption 1, that it could nonetheless order release under Exemption 3. And I think that's problematic in this case and out of step with C.I.A. v. Sims. So in Sims, what was being discussed by the court and the analysis the court was rejecting was the lower court's decision that certain identities of acknowledged C.I.A. sources could be disclosed without threat to national security. And the court said simply, under Exemption 1, we do a threat analysis. We do say, is there, does it meet the prong that this is properly classified? Under Exemption 3, that's baked into the analysis. Congress has passed a law that says you withhold the identities of sources and identities. We don't second guess whether the release of these specific sources is dangerous or not. That's it. In Fitzgibbon, there's one additional wrinkle added, which is that Congress also permitted under Exemption 1 some analysis of whether the passage of time has obviated whatever risk existed. And here again, the D.C. Circuit said, well, Sims told us we don't do that for Exemption 3. Exemption 3, the statute doesn't include anything about a passage of time. We're not going to read that into the statute. Courts don't have a freewheeling engagement with it. We don't disagree with any of this. That's not, as far as we can tell, at issue in at least a majority of what the government is challenging that the district court did. So turning just to what the – or sorry, I guess just if I may close that out. I think what's dangerous is to read Exemption 3 to say, so long as this document touches on or relates to intelligence sources or methods, it may be withheld in full under Exemption 3. That's the end of the analysis. Because if that were true, then obviously virtually everything the CIA does is related to intelligence. It would be withheld under Exemption 3. And that would contradict entirely Congress's repeated legislation in this arena, both to force the novel review of Exemption 1 and also to specifically refuse consistent legislative efforts to exempt the CIA entirely from FOIA. Are you contending that the mere fact that something has been published previously negates or overcomes the CIA's argument? Not at all, Your Honor. So I just want to be clear about what we're arguing. We don't take issue with the general idea that sometimes public materials can be classified within CIA files. The government pointed to one case in the Seventh Circuit in which people's CIA intelligence files were kept classified in their entirety. And the idea was no one knows what's in these files. No one knows what the CIA's intelligence gathering was doing as regarding a particular person or topic. And so if you were to get a list of every single thing in that file, or even if you were to get a list of everything in that file with all the classified information scrubbed and just a list of every public material the CIA had collected about someone or something, you would then possibly be able to infer what the CIA was interested in. That is an example of, I mean, I'm not saying the Seventh Circuit necessarily decided that specific case correctly, but that's at least an example of a logical and plausible reason where the CIA said, these are intelligence gathering files. They contain the results of our intelligence gathering. If we disclose what is in those files, then you may be able to infer our intelligence interests. That's something. On the other hand, what we have here, as far as we're aware, is a retrospective document written by the chief of the Office of Medical Services, looking back at his office's role in the CIA's torture program. It's a historical document. It is not an intelligent. Much of it has already been disclosed. Yes, Your Honor. Absolutely. And we think that bears very greatly on the analysis. Just as in New York Times v. DOJ, the fact that so much else had been disclosed about that document meant that this additional statutory analysis added nothing to the risk. Here, too, as we describe in our brief, this is a document the government acknowledges, discusses news reports, publicly available news reports, and takes issue with various parts of their description. At other times, just summarizes the contents of those news reports. The topic is known. It's the CIA's role in the torture program, and specifically the medical office's role. And it goes through chronologically and through different topics and discusses them. Now, the government has allowed the disclosure of certain articles and denied others. We, of course, don't know the basis. The only thing that the government points to in their brief is, originally, this public declaration that says if you comment on the accuracy of what's in the articles, that could tend to disclose a classified fact. And even the selection of what's in this report gives some indication to the thinking of the author. That's the other argument they make. Well, Your Honor, it's true they make that argument, but I want to distinguish those two very, very strongly because the first one, they say, is made by the CIA's declarant. The CIA's declarant says commenting on accuracy can disclose or not a classified fact. We can understand that. We don't argue with it. We didn't make the argument that, and the district court, critically, didn't either. Now, they might say the district court actually let through some descriptions of accuracy, even though he ordered otherwise. That's fine. The court can correct that, obviously. But they're making a far broader argument here. They're now saying, well, actually, whatever articles he selected are independently entitled. And I think there the key question is, well, why? Have they provided a reason for that? Because if you're talking about, say, an unknown CIA file in which we don't know what the topic is, we don't know when it was generated, we don't know what it's about, then perhaps seeing the selection might reveal something. Here we know this is an author going through, step by step, taking different articles that describe the torture program and his office's role in it. And so they have to meaningfully describe how it is that this selection actually reveals anything. Would you explain a little of the history of this case to me? This document was referred to in the Senate Select Committee report. Is that correct? Yes, Your Honor. That's where you heard of it? And you asked for everything? You asked for just this document or other things as well? So this was originally a case involving, I believe, 66 either documents or slightly broader categories of documents. But it was documents that were largely specifically referenced in the report. The government originally argued that this document was withholdable in full. This is called Document 66. But did you ask for other things besides this when the case began? Yes, Your Honor. There were a whole series of cables, investigator general reports. And you've received none of those or you've received all of them? I would say we received the vast majority of them, Your Honor, subject to various withholdings. This document was the subject of the most specific litigation. Correct. And now we're dealing with the redactions that Judge Hallerstein allowed. And the CIA is objecting to some of the redactions that he didn't allow. That's where we stand now, right? Is that your understanding? And that's the CIA's understanding? Yes, Your Honor. Correct. So you have the document . . . you have the redacted version of the document? Yes, Your Honor. Document 66? Yes. And you want more of the redactions removed? We're not actually here appealing anything, Your Honor. So we're here . . . You won. Below. Yeah. You know, Your Honor, we weren't given the opportunity to brief or argue about these specific redactions below. The government, as you've seen, is not making whatever arguments it's making on the public record. And so there were a series of ex parte reconsideration motions and otherwise. We didn't argue that these specific pieces of information had to or didn't have to be disclosed. Under FOIA, it's the government's burden, once the district court orders disclosure, to justify whatever they seek to protect. They offered, the first time around, an incredibly conclusory boilerplate description of the document. Judge Hallerstein said, okay, I don't accept that. And then they took several reconsideration opportunities to try to really explain why it is that these specific passages needed to be withheld. Over the course of the litigation below, several passages that they claimed and several citations that they claimed had to be withheld on national security grounds were, in fact, disclosed because the government ended up agreeing with the district court that they had erred. We're suggesting that we're not necessarily at the end of that road. The district court made further disagreements with the government as to whether additional public materials shorn of characterizations of accuracy can be disclosed. The government might tell you in chambers right now, well, that article says CIA secret prison in Afghanistan, and so we can't release that. Or that article says CIA prison in Thailand, which is a category that we can't release. And what we submitted to you in our opposition brief is that that doesn't logically or plausibly make sense, given that they've already permitted other articles in this very document that contain descriptions of facts that the CIA believes are classified. If the CIA doesn't believe that they have waived classification over those facts through disclosure of those articles, it does not make sense that additional public articles, again, shorn of characterizations of accuracy, themselves reveal classified information. I understand. Well, all right. It doesn't seem to me implausible that the argument doesn't seem to be implausible that foreign agents studying the records of this case and studying whatever is made available to them in the public record to study could draw valuable intelligence information simply from the identification of the fact that the CIA discussed a particular article in a secret memo while not discussing other articles, that the revelation of the one that is discussed and the comparison of it with others that were not discussed, I don't see anything improbable about the argument that that could reveal valuable secret information to foreign agents who would focus on now why would they have talked about this public article in their confidential secret memorandum while not talking about one that seems very similar that was published elsewhere. Let's compare the two and see and try to understand why this would have been the focus of discussion while another was not. That doesn't seem to be an improbable argument. Your Honor, this is where I think context is critical because this is not a document that's a black box, that we don't know what it's about. We don't know what the author is discussing. The author lays out his or her reason for writing it in the first place, which is this was an extraordinary moment in American history where medical professionals engaged in what certainly many people, including many courts, have described as torture. It's not that this is some sort of black box file where the discussion of what its contents might be would be revelatory. Also, I think the second piece of it that's contextual is that in CIA v. Sims, for example, when you're talking about otherwise seemingly innocuous information that a foreign adversary could piece together, there's at least some logical way. It's not just that the court accepts on faith from the government that some super foreign intelligence agency might draw some conclusions that are not apparent to any judge. There was a logical explanation given. They said if you disclose the names of the research institutions where people are affiliated who conducted CIA research, that would be enough for people who are knowledgeable about the type of research the CIA is conducting to try to figure out the identities of those people. If you gave the journals that they publish in, they would know the subject matter. Here again, the subject matter is no secret. We're talking about the CIA's torture program, and obviously you know more than I do, and we'll be looking in chambers at it, but I urge you not to just accept as plausible the basic premise that foreign adversaries have the wherewithal to discover any number of things, but instead to require a logical description of how these specific articles might lead to that revelation because that's the government's burden. And finally on that point, I think here the amicus brief filed by I think 22 different media organizations is useful background because it shows over and over and over and over that we receive as a society from the intelligence agencies blanket statements about how important these secrets are to keep, and then over and over when those people testify in front of Congress, they say actually we over classify very badly. And they even provide what I thought was a useful example in there of a public article in which the CIA simultaneously said one element of the public article couldn't be released for national security reasons, and in the same release released it, and the entire time it was of course a public article. The sentence that was redacted didn't add anything to any possible harm that existed, but there was a human error, an over classification impulse that's been well documented. All these things are the reasons why Congress overwrote a presidential veto and a Supreme Court decision to give Article III courts the power to look and demand logical and plausible explanations that hold up under some scrutiny. Thank you. Thank you, Your Honors. Thank you. We will confer in the roving room and invite the CIA and any other persons allowed to be there in ten minutes. We're going to take ten minutes to confer. Thank you.